COURT
OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

 

                                        NO.
2-04-444-CR

 

 

CHRISTOPHER J. HERNANDEZ                                               APPELLANT

 

                                                   V.

 

THE STATE OF TEXAS                                                                STATE

 

                                              ------------

 

           FROM
THE 297TH DISTRICT COURT OF TARRANT COUNTY

 

                                              ------------

 

                                MEMORANDUM
OPINION[1]

 

                                              ------------








Appellant Christopher J.
Hernandez appeals his conviction for recklessly causing serious bodily injury
to a child with the use of a deadly weapon. 
After convicting Appellant, the jury assessed his punishment at seventeen
years= confinement.  In four points,
Appellant asserts that the trial court erred by admitting into evidence the
statements obtained by police officers, by failing to give an instruction to
the jury regarding the voluntariness of the statements, by admitting 2,818
pages of medical records containing hearsay without allowing Appellant his
right to confront the parties making those records, and by refusing to admit
into evidence a learned treatise.  We affirm.

BACKGROUND

In a period of less than one
month, two-and-a-half year old Hannah Harley was admitted to Cook Children=s Hospital two times after sustaining injuries to her head.  On October 22, 2001, Hannah suffered from a
subdural hematoma, which did not require surgery because it was small and was
resolved on its own.  On November 7,
2001, Appellant and Janie Harley, Hannah=s mother, took an unconscious Hannah to Cook Children=s Hospital after Hannah sustained life-threatening injuries.  Doctors diagnosed Hannah with retinal
hemorrhages, cerebral edema, and a subdural hematoma in a second location; she
required neurosurgery to reduce the swelling in her brain.  She also sustained a skull fracture. 








Dr. Ronald L. Antinone, a
pediatric opthamologist, concluded that Hannah suffered from Shaken Baby
Syndrome.  Dr. Antinone testified that
the diagnosis of Shaken Baby Syndrome is made by eliminating other possible
causes of the injuries.  Based on his
observations, he concluded that Hannah=s physical injuries were consistent with injuries sustained as a
result of Shaken Baby Syndrome and they were not typically an injury that would
result from a fall, even from as high as four feet or from a person=s arms.

Dr. Warren Alan Marks, who
assisted Hannah through the rehabilitation process and was still treating her
at the time of trial, testified that Hannah=s skull could not have been fractured simply due to being shaken, but
that she also must have come into contact with a hard surface.  Dr. Marks testified that Hannah will never
make a full recovery.  She remains
partially paralyzed, her language is limited, and she continues to suffer from
a seizure disorder.  He testified that
she will likely require medication for an extended period of time, possibly for
the rest of her life. 








Appellant cross-examined each
of the doctors regarding Shaken Baby Syndrome, asking each about the viewpoint
that injuries such as those sustained by Hannah could result from causes other
than Shaken Baby Syndrome.  All but one
of the doctors were familiar with the work of Dr. Patrick Lantz and Dr. Mark
Donohoe, which proposed that the generally accepted premises regarding Shaken
Baby Syndrome cannot be supported by objective scientific evidence.  Appellant attempted to introduce into
evidence an article from the British Medical Journal that discussed the
findings of Dr. Lantz and Dr. Donohoe under the hearsay exception for learned
treatises.  See Tex. R. Evid. 803(18).  The State objected on the basis of hearsay,
relevance, and improper predicate, and the trial court sustained the objection.


In addition to the medical
testimony regarding Hannah=s condition, the State offered into evidence 2,818 pages of Hannah=s medical records.  The trial
court admitted the medical records into evidence over Appellant=s objection that the medical records contained statements from doctors
who were subpoenaed by Appellant but never testified, thereby denying Appellant
the opportunity to confront witnesses against him.  The trial court overruled the objection. 

Hannah was in Appellant=s care when she sustained the injuries on both occasions.  At the time, Appellant and Harley lived in a
three bedroom apartment with their child, Gabriel Hernandez; Hannah; and Harley=s mother, Debra Bayer.  Bayer
and Harley worked outside the home, and Appellant was responsible for the
children while the women were at work. 








After Hannah sustained the
injury on November 7, Appellant called Harley at work and told her that Hannah Athrew a fit@ when Bayer
left and had hit her head, but that she was breathing and sleeping.  Harley testified that Appellant called her at
work a second time, and with a shaking voice informed her that Hannah was not
responding.  Harley rushed home and asked
Appellant what had happened, and Appellant told her that Hannah had run into
the door and had fallen back onto the tile floor, hitting her head.  Harley and Appellant then rushed Hannah to
the hospital. 

Bayer joined Harley and
Appellant at the hospital.  Sergeant
Linda Stewart of the Fort Worth Police Department escorted them to the Alliance
for Children, which houses the Child Protective Services division of the Texas
Department of Protective and Regulatory Services[2]
(TDPRS) and a division of the Fort Worth Police Department, and she spoke with
them separately regarding the incident. 
Sergeant Stewart first met with Harely about the nature of Hannah=s injuries and obtained a typewritten statement from Harley regarding
the incident.








Segeant Stewart testified
that she subsequently met with Appellant and gave him Miranda warnings,[3]
which he read and initialed, before she spoke with him about Hannah=s case.  In his initial,
handwritten statement to police, Appellant explained that Hannah became upset
when Bayer left the home, hit her head against the door as she was chasing
Bayer, and began to scream and cry.  In
this initial statement, Appellant never stated that he shook Hannah.  The initial statement included the Miranda
warnings, which Appellant initialed. The separately signed Miranda warnings
and Appellant=s
handwritten statement were admitted into evidence and published to the jury.

After Appellant gave his
initial statement, a detective stationed at the hospital called Sergeant
Stewart and informed her that the nature of Hannah=s injuries indicated that she had suffered from Shaken Baby
Syndrome.  Sergeant Stewart apprised
Appellant that Hannah=s injuries
were life threatening and that Hannah must have sustained her injuries from
being shaken.  Sergeant Stewart testified
that Appellant became distraught after learning this and told her that he had
shaken Hannah in an attempt to revive her. 
Upon request, he demonstrated how he shook Hannah by shaking the
doll.  Sergeant Stewart testified that
Appellant shook the doll in a violent manner. 
Mike Linder, a Child Protective Services social worker, assisted in the
investigation.  He was present when
Appellant gave his statements to police, and he also viewed Appellant=s demonstration of how he shook Hannah.  Linder testified that Appellant first
demonstrated a very gentle shaking, and that he then explained to Appellant that
Hannah=s injuries were inconsistent with a gentle shaking.








Subsequently, Appellant gave
a second, typewritten statement to police officers, wherein he explained that
Hannah had followed Bayer as she left and had run into the door, so he went to
go pick her up, but because she was still wet from a bath, he lost his grip,
and she hit the floor.  He further stated
that Hannah was shaking and shivering, so he picked her up and shook her back
and forth violently in order to revive her. 
Appellant did not sign the first page of the typewritten statement.[4]  Sergeant Stewart testified that Appellant
gave this statement freely and voluntarily. 
This statement was admitted into evidence and published to the jury. 

Cresenso Hernandez, Appellant=s father, testified that he went to the Alliance for Children=s office and requested to see his son regarding an attorney, but an
officer denied him access to Appellant. 
According to Hernandez, the police officer told him he had to leave the
Alliance for Children=s office.  Sergeant Stewart testified that she did not
recall Hernandez=s attempting
to contact Appellant about obtaining a lawyer for Appellant, and she further
testified that she probably would have allowed Hernandez to speak with
Appellant if he had attempted to contact Appellant. 

 








VOLUNTARINESS OF THE SECOND
STATEMENT

In his first point, Appellant
complains that the second, typewritten statement that Appellant gave was not
voluntary because it was coerced and contained specific language that was not
his language, and the statement was intended to be and was tantamount to a
confession of guilt.[5]  The State contends that because Appellant was
not in custody at the time he made the statements, article 38.22 of the code of
criminal procedure and Miranda were not implicated.

1. Standard of Review








We review a trial court's ruling
on a motion to suppress evidence under a bifurcated standard of review.  Carmouche v. State, 10 S.W.3d 323, 327
(Tex. Crim. App. 2000); Guzman v. State, 955 S.W.2d 85, 89 (Tex. Crim.
App. 1997).  In reviewing the trial
court's decision, we do not engage in our own factual review.  Romero v. State, 800 S.W.2d 539, 543
(Tex. Crim. App. 1990); Best v. State, 118 S.W.3d 857, 861 (Tex. App.CFort Worth 2003, no pet.).  The
trial judge is the sole trier of fact and judge of the credibility of the
witnesses and the weight to be given their testimony.  State v. Ross, 32 S.W.3d 853, 855 (Tex.
Crim. App. 2000); State v. Ballard, 987 S.W.2d 889, 891 (Tex. Crim. App.
1999).  Therefore, we give almost total
deference to the trial court's rulings on (1) questions of historical fact and
(2) application-of-law-to-fact questions that turn on an evaluation of
credibility and demeanor.  Johnson v.
State, 68 S.W.3d 644, 652-53 (Tex. Crim. App. 2002); State v. Ballman, 157
S.W.3d 65, 67 (Tex. App.CFort Worth
2005, pet. ref=d).
However, when the trial court=s rulings do not turn on the credibility and demeanor of the
witnesses, we review de novo a trial court's rulings on mixed questions of law
and fact.  Johnson, 68 S.W.3d at
652-53.  Because the issue of custody is
a mixed question of law and fact, we will review de novo the trial court's
determination that Appellant was not in custody prior to the time he signed the
second statement.  Jeffley v. State,
38 S.W.3d 847, 853 (Tex. App.CHouston [14th Dist.] 2001, pet. ref'd). 








In a Jackson v. Denno hearing,
the trial judge determines the admissibility of a confession based on whether
or not the confession was voluntarily given and does not consider whether the
statement was truthful or untruthful.  Jackson
v. Denno, 378 U.S. 368, 376, 84 S. Ct. 1774, 1780 (1964); Dewberry v.
State, 4 S.W.3d 735, 747 (Tex. Crim. App. 1999), cert. denied,
529 U.S. 1131 (2000); see also Lego v. Twomey, 404 U.S. 477, 485, 92 S.
Ct. 619, 624‑625 (1972) (holding that whether a confession is true or false
is irrelevant to voluntariness determination because it is the methods used to
extract confession that may violate constitutional principles).  The trial court is the sole fact‑finder
at a Jackson v. Denno hearing and may choose to believe or disbelieve
any or all of the witnesses' testimony.  Dewberry,
4 S.W.3d at 747-48; see also Green v. State, 934 S.W.2d 92, 98‑99
(Tex. Crim. App. 1996), cert. denied, 520 U.S. 1200 (1997); Johnson
v. State, 803 S.W.2d 272, 287 (Tex. Crim. App. 1990), cert. denied,
501 U.S. 1259 (1991), overruled on other grounds, Heitman v. State,
815 S.W.2d 681, 690 (Tex. Crim. App. 1991). 
If Appellant=s confession
was involuntarily obtained, the trial court erred by admitting it at
trial.  See Sossamon v. State,
816 S.W.2d 340, 345 (Tex. Crim. App. 1991); see also Jackson, 378 U.S.
at 376, 84 S. Ct. at 1780.








In determining whether a
trial court's decision is supported by the record, we generally consider
evidence adduced at the suppression hearing only because the ruling was based
on it rather than on evidence introduced later. 
Rachal v. State, 917 S.W.2d 799, 809 (Tex. Crim. App.), cert.
denied, 519 U.S. 1043 (1996). 
However, this general rule is inapplicable where, as in this case, the
suppression issue has been consensually relitigated by the parties during trial
on the merits.  Id.  Where the State raises the issue at trial
either without objection or with subsequent participation in the inquiry by the
defense, the defendant has made an election to re‑open the evidence, and
consideration of the relevant trial testimony is appropriate in our
review.  Id.  In the case at bar, Appellant objected prior
to the State=s
introducing the second statement at trial. 
However, because Appellant fully participated in the relitigation of the
issue at trial, we may properly consider the trial testimony in reviewing the
trial court=s suppression
determination.  See id.

2. The Trial Court=s Findings

The trial court made detailed
findings of fact in the present case. 
The trial court found that Appellant=s two statements did not stem from a custodial interrogation and that
Appellant was not under arrest when the statements were made.  The court found that Appellant was free to
leave at any time during the making of the statements and that he did in fact
leave without being arrested on November 7, 2001. 








Although the trial court
determined that Appellant was not in custody, it recognized that Sergeant
Stewart gave Appellant the constitutional and statutory warnings, and on that
basis the trial court made additional findings regarding Appellant=s waiver of those rights.  The
trial court also found that Appellant freely, knowingly, intelligently, and
voluntarily waived any rights that he had and also waived the right to have an
attorney.  Furthermore, the trial court
found that Appellant gave the two statements voluntarily and that Appellant was
not coerced, deprived of anything, or mistreated in any way. Based on these
findings, the trial court determined that these statements were admissible as a
matter of law.

3. Custodial Interrogation 

The prosecution may not use
statements, whether exculpatory or inculpatory, stemming from custodial
interrogation of the defendant unless it demonstrates the use of procedural
safeguards effective to secure the privilege against self‑incrimination.  Miranda, 384 U.S. at 444, 86 S. Ct. at
1612.  Additionally, article 38.22 of the
code of criminal procedure applies only to statements made as a result of a
custodial interrogation.  See Tex. Code Crim. Proc. Ann. art. 38.22
(Vernon 2005). 

Custodial interrogation is
questioning initiated by law enforcement officers after a person has been taken
into custody or otherwise deprived of his freedom of action in any significant
way.  Miranda, 384 U.S. at 467, 86
S. Ct. at 1624. If an investigation is not at an accusatorial or custodial
stage, a person's Fifth Amendment rights have not yet come into play and the
voluntariness of those rights is not implicated.  Melton v. State, 790 S.W.2d 322, 326 (Tex.
Crim. App. 1990). 








Four factors are relevant to
determining whether a person is in custody: (1) probable cause to arrest; (2)
subjective intent of the police; (3) focus of the investigation; and (4)
subjective belief of the defendant.  Dowthitt
v. State, 931 S.W.2d 244, 254 (Tex. Crim. App. 1996).  Under Stansbury v. California, factors
two and four have become irrelevant except to the extent that they may be
manifested in the words or actions of police officers; the custody
determination is based entirely upon objective circumstances.  Dowthitt, 931 S.W.2d at 254; Stansbury
v. California, 511 U.S. 318, 322-23, 114 S. Ct. 1526, 1528-29 (1994). 








As a general rule, when a
person voluntarily accompanies law enforcement to a certain location, even
though he knows or should know that law enforcement suspects that he may have
committed or may be implicated in committing a crime, that person is not
restrained or Ain custody.@  Livingston v. State,
739 S.W.2d 311, 327 (Tex. Crim. App. 1987), cert. denied, 487 U.S. 1210
(1988).  More specifically, so long as
the circumstances show that a person is acting only upon the invitation,
request, or even urging of law enforcement, and there are no threats, either
express or implied, that he will be taken forcibly, the accompaniment is
voluntary, and such person is not in custody.  Anderson v. State, 932 S.W.2d 502, 505
(Tex. Crim. App. 1996), cert. denied, 521 U.S. 1122 (1997).  However, the mere fact that an interrogation
begins as noncustodial does not prevent custody from arising later; police
conduct during the encounter may cause a consensual inquiry to escalate into
custodial interrogation.  Ussery v.
State, 651 S.W.2d 767, 770 (Tex. Crim. App. 1983).








There are at least four
general situations in which a suspect=s detention may constitute custody: 
(1) when the suspect is physically deprived of his freedom of action in
any significant way; (2) when a law enforcement officer tells the suspect that
he cannot leave; (3) when law enforcement officers create a situation that
would lead a reasonable person to believe that his freedom of movement has been
significantly restricted; and (4) when there is probable cause to arrest and
law enforcement officers do not tell the suspect that he is free to leave.  Dowthitt, 931 S.W.2d at 255.  Stansbury indicates that in the first
through third situations, the restriction upon freedom of movement must amount
to the degree associated with an arrest as opposed to an investigative
detention.  Id.  Concerning the fourth situation, the officers= knowledge of probable cause must be manifested to the subject, and
such manifestation could occur if information sustaining the probable cause is
related by the officers to the suspect or by the suspect to the officers.  Dowthitt, 931 S.W.2d at 255; see
Ruth v. State, 645 S.W.2d 432, 436 (Tex. Crim. App. 1979) (holding that a
suspect's Astatement
that he had shot the victim immediately focused the investigation on him and
furnished probable cause to believe that he had committed an offense; [a]fter
that time, the continued interrogation must be considered a custodial one@).  However, situation four will
not automatically establish custody; rather, custody is established if the
manifestation of probable cause, combined with other circumstances, would lead
a reasonable person to believe that he is under restraint to the degree
associated with an arrest.  Dowhitt,
931 S.W.2d at 255.  Additionally, the
length of time involved is an important factor to consider in determining
whether a custodial interrogation occurred. 
Id. at 256.








Reviewing the entirety of the
evidence presented at trial, we conclude that Appellant=s freedom to move was restrained. 
Appellant, Harley, and Bayer accompanied Sergeant Stewart to the
Alliance for Children office to discuss Hannah=s injuries.  Appellant elicited
testimony from Sergeant Stewart regarding the office of the Alliance for
Children, where police questioned Appellant the date of the incident.  The Alliance for Children is a team that was
created for the purpose of investigating and prosecuting crimes against
children, including case workers from CPS, police officers, prosecutors, and doctors
that devote their time and attention to these cases.  The Alliance for Children is located in a
house that was modified for its purposes to include a security door, which
requires a buzzer to enter the office. 
Towards the back of the house are small rooms where interviews are
conducted, and beyond that area are offices 
designated exclusively for the police officers, where Appellant was
interviewed.       Harley testified that a
police officer sat in the front entry room of the house and that she did not
feel free to leave before her questioning. 
Sergeant Stewart testified that after learning that Hannah=s injuries were life-threatening, Appellant manifested his desire to
return to the hospital to see Hannah. Although Sergeant Stewart testified that
he was free to leave at any time, an hour passed between the time Appellant
expressed his desire to leave and the time that Appellant left the Alliance for
Children office.  Sergeant Stewart
acknowledged that Appellant was at the Alliance for Children office from 2:30
p.m. until 9:00 p.m.

Additionally, the record
reflects that Appellant had become the focus of the investigation. Sergeant
Stewart testified that she interviewed Harley and Bayer before interviewing
Appellant.  Appellant waited two hours
before being interviewed by Sergeant Stewart. 
Sergeant Stewart read Appellant his Miranda rights before he made
his first, handwritten statement to police; however, she did not give Miranda
warnings to Harley prior to Harley giving a statement. Sergeant Stewart
testified that she gave Appellant the required warnings because she had formed
some basis for suspecting him of injuring the child when she spoke with the
person who had referred the case to her because Appellant was alone with the
child when she was injured. 








The record also reflects that
Sergeant Stewart=s knowledge
of probable cause was manifested by Appellant. 
Initially, Sergeant Stewart was aware that Appellant was alone with
Hannah when she was injured; therefore, she realized the likelihood of his
involvement with the case.  In addition,
after Sergeant Stewart informed Appellant that Hannah=s injuries resulted from being shaken, Appellant informed Sergeant
Stewart that he had in fact shaken Hannah. Sergeant Stewart testified that
Appellant told her that he had shaken Hannah to revive her, and with a doll, he
demonstrated to her how he shook Hannah. 
At that point, Appellant gave the second, typewritten statement.  This information, in addition to Sergeant
Stewart=s knowledge that Appellant was alone with Hannah when she was injured,
amounted to probable cause to arrest.  See
Dowthitt, 931 S.W.2d at 256. 

In light of the length of the
interrogation, the fact that Appellant had become the focus of the
investigation, and Appellant=s damaging admission establishing probable cause to arrest, we believe
that custody of Appellant began before Appellant gave police his second
statement.  Because we reject the State=s contention that Appellant was not in custody at the time he gave
police the second statement, we will next examine whether Appellant=s statement was coerced, as Appellant alleges.

 








4. Voluntariness of the
Statement

Under Texas law, a suspect's
confession may be used against him only when it is freely and voluntarily made
without compulsion or persuasion. Tex.
Code Crim. Proc. Ann. art. 38.21 (Vernon 2005).  A confession may be deemed Ainvoluntary@ under three
different theories: (1) failure to comply with article 38.22, (2) failure to
comply with the dictates of Miranda v. Arizona, or (3) failure to comply
with due process or due course of law because the confession was not freely
given as a result of coercion, improper influences, or incompetency.  Wolfe v. State, 917 S.W.2d 270, 282
(Tex. Crim. App. 1996), cert. denied, 125 S. Ct. 2262 (2005).  The burden of proof at the hearing on
admissibility is on the prosecution, which must prove by a preponderance of the
evidence that the defendant's statement was given voluntarily.  Alvarado v. State,  912 S.W.2d 199, 211 (Tex. Crim. App. 1995).








Appellant contends that his
statement was involuntary because his statement was a product of coercion.  He asserts that the second, typewritten
statement was a result of Sergeant Stewart and Linder=s putting words into his mouth after informing him that he must have
shaken Hannah violently, as evidenced by the fact that his first statement
differs materially from the second. He suggests that Sergeant Stewart
intentionally caused him to be Aemotionally upset@ prior to the time he gave his second statement by telling him that
Hannah might not survive.  In alleging
that the second statement was coerced, Appellant also points to the fact that,
according to the times written on the statements indicating when the statements
were made, the second statement took an hour and forty-five minutes longer to
type than Appellant took to give the initial, handwritten statement.  Appellant did not testify, and the
uncontroverted testimony of both Sergeant Stewart and Linder establishes that
Appellant was not coerced into giving his second statement.  We do not conclude that merely because
Appellant gave a second statement to police after learning of the extent of
Hannah=s injuries and because the second statement took longer to compose,
the police coerced Appellant into making the statement by intentionally
upsetting Appellant emotionally or putting words into Appellant=s mouth. 








Appellant further contends
that the atmosphere was coercive because he was held for a period in excess of
six hours and, with the exception of Sergeant Stewart and Linder, he was denied
access to anyone, including his father.  The
fact that Appellant was not informed that his father requested to see him in
order to speak with him regarding an attorney is not legally significant, in
light of the Supreme Court=s determination that police officers are not required to inform a
suspect that his family has retained counsel on his behalf.  See Moran v. Burbine, 475 U.S.
412, 420-23, 106 S. Ct. 1135, 1140-41 (1986) (holding that events occurring
outside of the presence of the suspect and entirely unknown to him have no
bearing on his capacity to comprehend and knowingly relinquish a constitutional
right).

Having reviewed the record,
we conclude that the evidence presented supports the trial court's finding that
no coercive conduct occurred with respect to the taking of Appellant's
statement.  We overrule Appellant=s first point.

JURY INSTRUCTION

In his second point,
Appellant complains that the trial court erred in failing to give an
instruction to the jury regarding the voluntariness of Appellant=s second statement.  Appellant
timely requested a jury instruction regarding the voluntariness of his second
statement, and the trial court denied the request. The State asserts that
article 38.22 is inapplicable because Appellant was not in custody when he made
the statement.  We have already rejected
this contention.  The State alternatively
contends that the record reflects that the trial court properly refused the
request for a charge on the voluntariness of Appellant=s second statement because there was no fact issue for the jury to
resolve that would impact the admissibility of the statement.[6]









Appellate review of error in
a jury charge involves a two-step process. 
Abdnor v. State, 871 S.W.2d 726, 731 (Tex. Crim. App. 1994).  Initially, we must determine whether error
occurred.  Id.  If so, we must then evaluate whether
sufficient harm resulted from the error to require reversal.  Id. at 731-32. 








Under article 38.21, Aa statement of an accused may be used in evidence against him if it
appears that the same was freely and voluntarily made without compulsion or
persuasion. . . .@  Tex. Code Crim. Proc. Ann. art. 38.21.  Article 38.23(a) states that no evidence
obtained by an officer in violation of any law of the State of Texas shall be
admitted into evidence against the accused in the trial of a criminal case.  Tex.
Code Crim. Proc. Ann. art. 38.23(a) (Vernon 2005).  The terms of article 38.23(a) are mandatory.  Mendoza v. State, 88 S.W.3d 236, 239 (Tex.
Crim. App. 2002).  Therefore, when an
issue of fact is raised as to compulsion or persuasion in obtaining a
confession, a defendant has a statutory right to have the jury charged
accordingly.  Id.; Sorto v. State,
173 S.W.3d 469, 488 (Tex. Crim. App. 2005). 
The evidence that raises the issue may be from any source and may be
strong, weak, contradicted, unimpeached, or unbelievable.  Muniz v. State, 851 S.W.2d 238, 254
(Tex. Crim. App.), cert. denied, 510 U.S. 837 (1993). 

When a party raises an issue
regarding whether evidence was obtained in violation of the laws of Texas or
the United States, the jury shall be instructed that if it believes, or has a
reasonable doubt, that the evidence was obtained because of such a violation,
then the jury shall disregard any such evidence.  Tex. Code Crim. Proc. Ann.
art. 38.23(a); see also Miniel v. State, 831 S.W.2d 310, 316
(Tex. Crim. App.), cert. denied, 506 U.S. 885 (1992); Thomas v. State,
723 S.W.2d 696, 707 (Tex. Crim. App. 1986). 








Error in the charge, if
timely objected to in the trial court, requires reversal if the error was Acalculated to injure [the] rights of the defendant,@ which means no more than that there must be some harm to the
accused from the error.  Tex. Code Crim. Proc. Ann. art. 36.19
(Vernon 1981); see also Abdnor, 871 S.W.2d at 731-32; Almanza v.
State, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh=g), cert. denied, 481 U.S. 1019 (1987).  In other words, a properly preserved error
will call for reversal as long as the error is not harmless.  Almanza, 686 S.W.2d at 171.  In making this determination, Athe actual degree of harm must be assayed in light of the entire jury
charge, the state of the evidence, including the contested issues and weight of
probative evidence, the argument of counsel and any other relevant information
revealed by the record of the trial as a whole.@  Id.; see also Ovalle
v. State, 13 S.W.3d 774, 786 (Tex. Crim. App. 2000).  The burden of proof lies with the appellant
to persuade the reviewing court that he suffered some actual harm as a
consequence of the charging error, and if he is unable to do so, the error will
not result in a reversal of his conviction. 
Abnor, 871 S.W.2d at 732.

In the present case,
Appellant did not testify at the suppression hearing or at trial.  On cross-examination of Sergeant Stewart, the
following discourse occurred: 

[DEFENSE
COUNSEL:]  Isn=t it
true that after the typed version was typed up, [Appellant] reviewed it and
objected to the portion about violently shaking the baby?

 

[SERGEANT
STEWART:]  No.

 

[DEFENSE
COUNSEL:]  He didn=t
tell you that he didn=t
want that part in there?

 

[SERGEANT STEWART:]  No. 

 

[DEFENSE
COUNSEL:]  And the first page wasn=t
scratched out, torn up, thrown away, and say [sic] we=ll
type it again?

 

[SERGEANT
STEWART:] No.

 

The
State later questioned Linder about the investigation of Appellant:

 

[PROSECUTOR:]
And did [Sergeant Stewart] ask the [Appellant] to demonstrate how he shook that
baby?

 

[LINDER:]
Yes, I believe so. 

 








[PROSECUTOR:]
And did you watch him do that demonstration?

 

[LINDER:]
Yes.

 

[PROSECUTOR:]
And could you show this jury how he shook that baby?

 

[LINDER:]
At first just very gently (demonstrating).

 

[PROSECUTOR:]
And knowing what you knew from . . . your investigation at that point, did you all
ask him to do that again or correct him in any way and say that=s not
possible?

 

[LINDER:]
Well, I explained that the injuries that occurred would not result from a
general shaking, they resulted from a violent shaking. 

 

[PROSECUTOR:]
And did you ask the [Appellant] to demonstrate again?

 

[LINDER:]
I don=t
recall.

 

Then,
on cross-examination of Linder, the following exchange occurred:

 

[DEFENSE
COUNSEL:] And I know you said it real softly, but I think you said that
demonstrating the doll he shook the doll gently?

 

[LINDER:]
Yes, sir.

 

[DEFENSE
COUNSEL:] Not violently?

 

[LINDER:]
Beg your pardon?

 

[DEFENSE
COUNSEL:] Not violently?

 

[LINDER:]
That=s
correct.

 








As evidenced from this
dialogue, Linder acknowledged that Appellant demonstrated shaking the baby
gently, not violently.  This is some
evidence in support of Appellant=s claim that the words in this second statement were not his own and
that the statement he signed did not use the term Aviolently.@  Although the evidence showing compulsion or
persuasion in giving the statement may be meager or weak, we determine that the
evidence put forth is sufficient to raise a fact issue before the jury
regarding whether the statement given to police was in fact Appellant=s statement.  We conclude that
Appellant properly raised this issue before the jury and a fact issue exists
for the jury to determine.  We hold that
the trial court erred in denying Appellant=s request for a jury instruction on the voluntariness of his second
statement.

Having found error, we must
conduct a harm analysis to determine whether sufficient harm resulted from the
error to require reversal.  See Abdnor,
871 S.W.2d at 731.  We review the entire
record to determine whether Appellant suffered some actual harm; theoretical
harm is not sufficient to constitute reversible error.  See Arline v. State, 721 S.W.2d 348,
351‑52 (Tex. Crim. App. 1986). 
Appellant has not addressed whether he suffered any harm from the trial
court=s failure to include the requested instruction, and he did not  point to any portion of the record where harm
might be demonstrated.








The evidence established that
Appellant was alone with Hannah when she was injured.  Dr. Antinone concluded that Hannah had
suffered from Shaken Baby Syndrome.  Dr.
Marks testified that not only was Hannah shaken, but her head also must have
come into contact with a hard surface. 
Linder, who is an experienced CPS investigator, also testified that the
injuries Hannah sustained were not consistent with a gentle shaking.  Sergeant Stewart testified that before
Appellant gave his second statement, Appellant demonstrated with a doll the
manner in which he shook Hannah, and that Appellant demonstrated by shaking the
doll violently. 

In light of the record as a
whole, we hold that the trial court=s error in refusing to include an instruction as to the voluntariness
of the statements did not cause Appellant any harm, and therefore, does not
constitute reversible error.[7]  We overrule Appellant=s second point. 

ADMISSION OF MEDICAL RECORDS








In his third point, Appellant
complains that the trial court erred in admitting 2,818 pages of medical
records containing hearsay without affording 
him the right of confrontation. 
The State asserts that Appellant=s broad objection was insufficient to allow the trial court to
determine what part, if any, of the medical records was inadmissible.  Alternatively, the State contends that the
trial court did not abuse its discretion in admitting the medical records
pertaining to Hannah=s injuries.

We review a trial court's
admission or exclusion of evidence for an abuse of discretion.  Rankin v. State, 974 S.W.2d 707, 718
(Tex. Crim. App. 1996) (op. on reh=g); Montgomery v. State, 810 S.W.2d 372, 391 (Tex. Crim. App.
1991) (op. on reh=g).  A trial court does not abuse its discretion,
and we will not reverse a trial court's ruling, unless the ruling falls outside
the zone of reasonable disagreement.  Rankin,
974 S.W.2d at 718.  A trial court
abuses its discretion when it acts without reference to any guiding rules and
principles or acts arbitrarily or unreasonably. 
Montgomery, 810 S.W.2d at 380.

The court of criminal appeals
has recognized that when faced with a general objection the trial court has no
obligation to sort through the challenged evidence in order to segregate
admissible evidence from inadmissible evidence. 
Barnes v. State, 876 S.W.2d 316, 329 (Tex. Crim. App.), cert.
denied, 513 U.S. 861 (2004).  The
court recognized that the trial court may choose to admit or exclude the
evidence as a whole, and the losing party will suffer the consequences for his
failure to object with sufficient specificity. Id.








While Appellant specified the
legal basis for his objection, he failed to specify the portion or portions of
the 2,818 pages of medical records where the obejctionable statements may be
found.  Instead, Appellant made what can
be characterized as a Ageneral@ objection that the medical records violated the confrontation clause
under the holding of Crawford v. Washington, 541 U.S. 36, 59, 124 S. Ct.
1354, 1369 (2004), because the medical records contained statements made by
doctors who did not testify at trial, and thus, were not subject to
cross-examination.  At no point did
Appellant specify the pages that contained the statements by the doctors who
were not subject to cross-examination. 
We hold that the trial court did not abuse its discretion by overruling
Appellant=s broad
objection to the 2,818 pages of medical records.  Accordingly, we overrule Appellant=s third point. 

LEARNED TREATISE

In his final point, Appellant
argues that the trial court erred in failing to admit an article from the
British Medical Journal that refuted the scientific theory upon which the State=s medical experts relied.  The
State contends that the trial court did not abuse its discretion in refusing to
admit the article because a learned treatise is not admissible as an exhibit. 








We review a trial court's
admission or exclusion of evidence for an abuse of discretion.  Rankin, 974 S.W.2d at 718; Montgomery,
810 S.W.2d at 391.  A trial court does
not abuse its discretion, and we will not reverse a trial court's ruling,
unless the ruling falls outside the zone of reasonable disagreement.  Rankin, 974 S.W.2d at 718.

Texas Rule of Evidence
803(18) provides that a learned treatise is not excluded as hearsay to the
extent it is called to the attention of an expert witness upon
cross-examination.[8]  Tex.
R. Evid. 803(18).  If admitted,
the rule allows the statements to be read into evidence, but the statements may
not be received as exhibits.  Id.  The clear language of the rule prohibits
the publication of the learned treatise to the jury.  See id.

In the present case,
Appellant had the opportunity to cross-examine the State=s medical experts on Shaken Baby Syndrome and the minority viewpoint
contained in the article suggesting that injuries such as those sustained by
Hannah could result from causes other than Shaken Baby Syndrome.  We hold that the trial court did not abuse
its discretion in refusing to receive the article itself as an exhibit.  We overrule Appellant=s fourth point.

 

 








CONCLUSION

Having overruled each of Appellant=s four points, we affirm the trial court=s judgment.

PER CURIAM

PANEL F:  HOLMAN, LIVINGSTON, and DAUPHINOT, JJ.

 

DO NOT PUBLISH

Tex.
R. App. P. 47.2(b)

 

DELIVERED:  December 22, 2005











[1]See Tex. R. App. P. 47.4





[2]The name of the agency has changed
to the Texas Department of Family and Protective Services effective September
1, 2003.  See Act of June 2, 2003,
78th Leg., R.S., ch. 198, '' 1.01(b)(4)(J), 1.27, 2003 Tex. Gen. Laws 611, 641, 729.





[3]See Miranda
v. Arizona, 384 U.S. 436, 86 S. Ct. 1602 (1966).  





[4] The
first statement contained typewritten Miranda warnings and blank lines
for a person to write a narrative.  The
form provides a line for the signature of the affiant and a witness and a place
to fill in the time, place, and date. 
Appellant=s
first statement is handwritten and each of the three pages is signed by
Appellant and a witness, and the time, place, and date lines have been filled
in.  Appellant=s
second statement is two pages long and is completely typewritten.  There is no signature line on the first
page.  There is a signature line on the
second page for the affiant and a witness, both of whom signed the second page.





[5] In
his argument on appeal, Appellant acknowledges that his first statement was
voluntarily given. 





[6] In a
footnote, the State asserts that Appellant=s trial objection does not
comport with his complaint on appeal because at trial Appellant requested a
jury instruction as to the voluntariness of the oral statements, but on appeal
Appellant refers to the voluntariness of the written statements he made to
Sergeant Stewart.  It is clear from the
record that the parties and the trial court understood the basis for Appellant=s
objection in light of the State=s response to that objection.





[7]See
Hernandez v. State, No. 03-02-00489-CR, 2003 WL 22207209, at *2-3
(Tex. App.CAustin
Sept. 25, 2003, no pet.) (mem. op.) (not designated for publication) (holding
jury should have received article 38.23 instruction regarding the appellant=s
statement, but failure to so instruct was not reversible error because in light
of the entire record, the trial court's error in refusing to include a general
instruction as to the admissibility of a statement did not cause the appellant
any harm).





[8] Rule
803(18) exempts statements contained in published treatises, periodicals, or
pamphlets on a subject of history, medicine, or other science or art,
established as a reliable authority by the testimony or admission of the
witness or by other expert testimony or by judicial notice from the rule prohibiting
hearsay.