HERNANDEZ v. STATE

COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-04-444-CR

CHRISTOPHER J. HERNANDEZ APPELLANT

V.

THE STATE OF TEXAS STATE

------------

FROM THE 297TH DISTRICT COURT OF TARRANT COUNTY

------------

MEMORANDUM OPINION
(footnote: 1)

------------

Appellant Christopher J. Hernandez appeals his conviction for recklessly causing serious bodily injury to a child with the use of a deadly weapon.  After convicting Appellant, the jury assessed his punishment at seventeen years’ confinement.  In four points, Appellant asserts that the trial court erred by admitting into evidence the statements obtained by police officers, by failing to give an instruction to the jury regarding the voluntariness of the statements, by admitting 2,818 pages of medical records containing hearsay without allowing Appellant his right to confront the parties making those records, and by refusing to admit into evidence a learned treatise.  We affirm.

BACKGROUND

In a period of less than one month, two-and-a-half year old Hannah Harley was admitted to Cook Children’s Hospital two times after sustaining injuries to her head.  On October 22, 2001, Hannah suffered from a subdural hematoma, which did not require surgery because it was small and was resolved on its own.  On November 7, 2001, Appellant and Janie Harley, Hannah’s mother, took an unconscious Hannah to Cook Children’s Hospital after Hannah sustained life-threatening injuries.  Doctors diagnosed Hannah with retinal hemorrhages, cerebral edema, and a subdural hematoma in a second location; she required neurosurgery to reduce the swelling in her brain.  She also sustained a skull fracture. 

Dr. Ronald L. Antinone, a pediatric opthamologist, concluded that Hannah suffered from Shaken Baby Syndrome.  Dr. Antinone testified that the diagnosis of Shaken Baby Syndrome is made by eliminating other possible causes of the injuries.  Based on his observations, he concluded that Hannah’s physical injuries were consistent with injuries sustained as a result of Shaken Baby Syndrome and they were not typically an injury that would result from a fall, even from as high as four feet or from a person’s arms.

Dr. Warren Alan Marks, who assisted Hannah through the rehabilitation process and was still treating her at the time of trial, testified that Hannah’s skull could not have been fractured simply due to being shaken, but that she also must have come into contact with a hard surface.  Dr. Marks testified that Hannah will never make a full recovery.  She remains partially paralyzed, her language is limited, and she continues to suffer from a seizure disorder.  He testified that she will likely require medication for an extended period of time, possibly for the rest of her life. 

Appellant cross-examined each of the doctors regarding Shaken Baby Syndrome, asking each about the viewpoint that injuries such as those sustained by Hannah could result from causes other than Shaken Baby Syndrome.  All but one of the doctors were familiar with the work of Dr. Patrick Lantz and Dr. Mark Donohoe, which proposed that the generally accepted premises regarding Shaken Baby Syndrome cannot be supported by objective scientific evidence.  Appellant attempted to introduce into evidence an article from the British Medical Journal that discussed the findings of Dr. Lantz and Dr. Donohoe under the hearsay exception for learned treatises.  
See
 
Tex. R. Evid.
 803(18).  The State objected on the basis of hearsay, relevance, and improper predicate, and the trial court sustained the objection. 

In addition to the medical testimony regarding Hannah’s condition, the State offered into evidence 2,818 pages of Hannah’s medical records.  The trial court admitted the medical records into evidence over Appellant’s objection that the medical records contained statements from doctors who were subpoenaed by Appellant but never testified, thereby denying Appellant the opportunity to confront witnesses against him.  The trial court overruled the objection. 

Hannah was in Appellant’s care when she sustained the injuries on both occasions.  At the time, Appellant and Harley lived in a three bedroom apartment with their child, Gabriel Hernandez; Hannah; and Harley’s mother, Debra Bayer.  Bayer and Harley worked outside the home, and Appellant was responsible for the children while the women were at work. 

After Hannah sustained the injury on November 7, Appellant called Harley at work and told her that Hannah “threw a fit” when Bayer left and had hit her head, but that she was breathing and sleeping.  Harley testified that Appellant called her at work a second time, and with a shaking voice informed her that Hannah was not responding.  Harley rushed home and asked Appellant what had happened, and Appellant told her that Hannah had run into the door and had fallen back onto the tile floor, hitting her head.  Harley and Appellant then rushed Hannah to the hospital. 

Bayer joined Harley and Appellant at the hospital.  Sergeant Linda Stewart of the Fort Worth Police Department escorted them to the Alliance for Children, which houses the Child Protective Services division of the Texas Department of Protective and Regulatory Services
(footnote: 2) (TDPRS) and a division of the Fort Worth Police Department, and she spoke with them separately regarding the incident.  Sergeant Stewart first met with Harely about the nature of Hannah’s injuries and obtained a typewritten statement from Harley regarding the incident.

Segeant Stewart testified that she subsequently met with Appellant and gave him 
Miranda 
warnings,
(footnote: 3) which he read and initialed, before she spoke with him about Hannah’s case.  In his initial, handwritten statement to police, Appellant explained that Hannah became upset when Bayer left the home, hit her head against the door as she was chasing Bayer, and began to scream and cry.  In this initial statement, Appellant never stated that he shook Hannah.  The initial statement included the 
Miranda 
warnings, which Appellant initialed. The separately signed 
Miranda 
warnings and Appellant’s handwritten statement were admitted into evidence and published to the jury.

After Appellant gave his initial statement, a detective stationed at the hospital called Sergeant Stewart and informed her that the nature of Hannah’s injuries indicated that she had suffered from Shaken Baby Syndrome.  Sergeant Stewart apprised Appellant that Hannah’s injuries were life threatening and that Hannah must have sustained her injuries from being shaken.  Sergeant Stewart testified that Appellant became distraught after learning this and told her that he had shaken Hannah in an attempt to revive her.  Upon request, he demonstrated how he shook Hannah by shaking the doll.  Sergeant Stewart testified that Appellant shook the doll in a violent manner.  Mike Linder, a Child Protective Services social worker, assisted in the investigation.  He was present when Appellant gave his statements to police, and he also viewed Appellant’s demonstration of how he shook Hannah.  Linder testified that Appellant first demonstrated a very gentle shaking, and that he then explained to Appellant that Hannah’s injuries were inconsistent with a gentle shaking.

Subsequently, Appellant gave a second, typewritten statement to police officers, wherein he explained that Hannah had followed Bayer as she left and had run into the door, so he went to go pick her up, but because she was still wet from a bath, he lost his grip, and she hit the floor.  He further stated that Hannah was shaking and shivering, so he picked her up and shook her back and forth violently in order to revive her.  Appellant did not sign the first page of the typewritten statement.
(footnote: 4)  Sergeant Stewart testified that Appellant gave this statement freely and voluntarily.  This statement was admitted into evidence and published to the jury. 

Cresenso Hernandez, Appellant’s father, testified that he went to the Alliance for Children’s office and requested to see his son regarding an attorney, but an officer denied him access to Appellant.  According to Hernandez, the police officer told him he had to leave the Alliance for Children’s office.  Sergeant Stewart testified that she did not recall Hernandez’s attempting to contact Appellant about obtaining a lawyer for Appellant, and she further testified that she probably would have allowed Hernandez to speak with Appellant if he had attempted to contact Appellant. 

VOLUNTARINESS OF THE SECOND STATEMENT

In his first point, Appellant complains that the second, typewritten statement that Appellant gave was not voluntary because it was coerced and contained specific language that was not his language, and the statement was intended to be and was tantamount to a confession of guilt.
(footnote: 5)  The State contends that because Appellant was not in custody at the time he made the statements, article 38.22 of the code of criminal procedure and 
Miranda
 were not implicated.

1. Standard of Review

We 
review a trial court's ruling on a motion to suppress evidence under a bifurcated standard of review.  
Carmouche v. State
, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000); 
Guzman v. State,
 955 S.W.2d 85, 89 (Tex. Crim. App. 1997).  In reviewing the trial court's decision, we do not engage in our own factual review.  
Romero v. State,
 800 S.W.2d 539, 543 (Tex. Crim. App. 1990); 
Best v. State,
 118 S.W.3d 857, 861 (Tex. App.—Fort Worth 2003, no pet.).  The trial judge is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given their testimony. 
 State v. Ross,
 32 S.W.3d 853, 855 (Tex. Crim. App. 2000); 
State v. Ballard, 
987 S.W.2d 889, 891 (Tex. Crim. App. 1999). 
 Therefore, we give almost total deference to the trial court's rulings on (1) questions of historical fact and (2) application-of-law-to-fact questions that turn on an evaluation of credibility and demeanor. 
 Johnson v. State,
 68 S.W.3d 644, 652-53 (Tex. Crim. App. 2002);
 
State v. Ballman, 
157 S.W.3d 65, 67 (Tex. App.—Fort Worth 2005, pet. ref’d)
.
 However, when the trial court’s rulings do not turn on the credibility and demeanor of the witnesses, we review de novo a trial court's rulings on mixed questions of law and fact.  
Johnson,
 68 S.W.3d at 652-53.  Because the issue of custody is a mixed question of law and fact, we will review de novo the trial court's determination that Appellant was not in custody prior to the time he signed the second statement.  
Jeffley v. State
, 38 S.W.3d 847, 853 (Tex. App.
—
Houston [14th Dist.] 2001, pet. ref'd). 

In a 
Jackson v. Denno 
hearing, the trial judge determines the admissibility of a confession based on whether or not the confession was voluntarily given and does not consider whether the statement was truthful or untruthful.  
Jackson v. Denno
, 378 U.S. 368, 376, 84 S. Ct. 1774, 1780 (1964);
 Dewberry v. State
, 4 S.W.3d 735, 747 (Tex.
 
Crim. App. 1999)
, 
cert. denied
, 529 U.S. 1131 (2000); 
see also Lego v. Twomey
, 404 U.S. 477, 485, 92 S. Ct. 619, 624-625 (1972) (holding that whether a confession is true or false is irrelevant to voluntariness determination because it is the methods used to extract confession that may violate constitutional principles).  The trial court is the sole fact-finder at a 
Jackson v. Denno 
hearing and may choose to believe or disbelieve any or all of the witnesses' testimony.  
Dewberry
, 4 S.W.3d at 747-48;
 see also Green v. State
, 934 S.W.2d 92, 98-99 (Tex. Crim. App. 1996), 
cert. denied
, 520 U.S. 1200 (1997); 
Johnson v. State
, 803 S.W.2d 272, 287 (Tex. Crim. App. 1990), 
cert. denied
, 501 U.S. 1259 (1991), 
overruled on other grounds
, 
Heitman v. State
, 815 S.W.2d 681, 690 (Tex. Crim. App. 1991).  If Appellant’s confession was involuntarily obtained, the trial court erred by admitting it at trial.  
See
 
Sossamon v. State
, 816 S.W.2d 340, 345 (Tex. Crim. App. 1991);
 see also Jackson
, 378 U.S. at 376, 84 S. Ct. at 1780.

In determining whether a trial court's decision is supported by the record, we generally consider evidence adduced at the suppression hearing only because the ruling was based on it rather than on evidence introduced later.  
Rachal v. State
, 917 S.W.2d 799, 809 (Tex. Crim. App.), 
cert. denied
, 519 U.S. 1043 (1996).  However, this general rule is inapplicable where, as in this case, the suppression issue has been consensually relitigated by the parties during trial on the merits. 
 Id. 
 Where the State raises the issue at trial either without objection or with subsequent participation in the inquiry by the defense, the defendant has made an election to re-open the evidence, and consideration of the relevant trial testimony is appropriate in our review.  
Id.
  In the case at bar, Appellant objected prior to the State’s introducing the second statement at trial.  However, because Appellant fully participated in the relitigation of the issue at trial, we may properly consider the trial testimony in reviewing the trial court’s suppression determination.  
See id
.

2. The Trial Court’s Findings

The trial court made detailed findings of fact in the present case.  The trial court found that Appellant’s two statements did not stem from a custodial interrogation and that Appellant was not under arrest when the statements were made.  The court found that Appellant was free to leave at any time during the making of the statements and that he did in fact leave without being arrested on November 7, 2001. 

Although the trial court determined that Appellant was not in custody, it recognized that Sergeant Stewart gave Appellant the constitutional and statutory warnings, and on that basis the trial court made additional findings regarding Appellant’s waiver of those rights.  The trial court also found that Appellant freely, knowingly, intelligently, and voluntarily waived any rights that he had and also waived the right to have an attorney.  Furthermore, the trial court found that Appellant gave the two statements voluntarily and that Appellant was not coerced, deprived of anything, or mistreated in any way. Based on these findings, the trial court determined that these statements were admissible as a matter of law.

3. Custodial Interrogation 

The prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination.  
Miranda
, 384 U.S. at 444, 86 S. Ct. at 1612.  Additionally, article 38.22 of the code of criminal procedure applies only to statements made as a result of a custodial interrogation.  
See 
Tex. Code Crim. Proc. Ann.
 art. 38.22 (Vernon 2005). 

Custodial interrogation is questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.  
Miranda
, 384 U.S. at 467, 86 S. Ct. at 1624. 
If an investigation is not at an accusatorial or custodial stage, a person's Fifth Amendment rights have not yet come into play and the voluntariness of those rights is not implicated. 
 Melton v. State
, 790 S.W.2d 322, 326 (Tex. Crim. App. 1990).
 

Four factors are relevant to determining whether a person is in custody: (1) probable cause to arrest; (2) subjective intent of the police; (3) focus of the investigation; and (4) subjective belief of the defendant.  
Dowthitt v. State
, 931 S.W.2d 244, 254 (Tex. Crim. App. 1996).  Under 
Stansbury v. California
, factors two and four have become irrelevant except to the extent that they may be manifested in the words or actions of police officers; the custody determination is based entirely upon objective circumstances.  
Dowthitt
, 931 S.W.2d at 254; 
Stansbury v. California
, 511 U.S. 318, 322-23, 114 S. Ct. 1526, 1528-29 (1994). 

As a general rule, when a person voluntarily accompanies law enforcement to a certain location, even though he knows or should know that law enforcement suspects that he may have committed or may be implicated in committing a crime, that person is not restrained or “in custody.”  
Livingston v. State
, 739 S.W.2d 311, 327 (Tex. Crim. App. 1987), 
cert. denied
, 487 U.S. 1210 (1988).  More specifically, so long as the circumstances show that a person is acting only upon the invitation, request, or even urging of law enforcement, and there are no threats, either express or implied, that he will be taken forcibly, the accompaniment is voluntary, and such person is not in custody. 
 Anderson v. State
, 932 S.W.2d 502, 505 (Tex. Crim. App. 1996), 
cert. denied
, 521 U.S. 1122 (1997).  However, the mere fact that an interrogation begins as noncustodial does not prevent custody from arising later; police conduct during the encounter may cause a consensual inquiry to escalate into custodial interrogation. 
 Ussery v. State
, 651 S.W.2d 767, 770 (Tex. Crim. App. 1983).

There are at least four general situations in which a suspect’s detention may constitute custody:  (1) when the suspect is physically deprived of his freedom of action in any significant way; (2) when a law enforcement officer tells the suspect that he cannot leave; (3) when law enforcement officers create a situation that would lead a reasonable person to believe that his freedom of movement has been significantly restricted; and (4) when there is probable cause to arrest and law enforcement officers do not tell the suspect that he is free to leave.  
Dowthitt
, 931 S.W.2d at 255.  
Stansbury
 indicates that in the first through third situations, the restriction upon freedom of movement must amount to the degree associated with an arrest as opposed to an investigative detention.  
Id
.  Concerning the fourth situation, the officers’ knowledge of probable cause must be manifested to the subject, and such manifestation could occur if information sustaining the probable cause is related by the officers to the suspect or by the suspect to the officers. 
 
Dowthitt
, 931 S.W.2d at 255; 
see Ruth v. State, 
645 S.W.2d 432, 436 (Tex. Crim. App. 1979) (holding that a suspect's “statement that he had shot the victim immediately focused the investigation on him and furnished probable cause to believe that he had committed an offense; [a]fter that time, the continued interrogation must be considered a custodial one”).  However, situation four will not automatically establish custody; rather, custody is established if the manifestation of probable cause, combined with other circumstances, would lead a reasonable person to believe that he is under restraint to the degree associated with an arrest.  
Dowhitt
, 931 S.W.2d at 255.  Additionally, the length of time involved is an important factor to consider in determining whether a custodial interrogation occurred.  
Id
. at 256.

Reviewing the entirety of the evidence presented at trial, we conclude that Appellant’s freedom to move was restrained.  Appellant, Harley, and Bayer accompanied Sergeant Stewart to the Alliance for Children office to discuss Hannah’s injuries.  Appellant elicited testimony from Sergeant Stewart regarding the office of the Alliance for Children, where police questioned Appellant the date of the incident.  The Alliance for Children is a team that was created for the purpose of investigating and prosecuting crimes against children, including case workers from CPS, police officers, prosecutors, and doctors that devote their time and attention to these cases.  The Alliance for Children is located in a house that was modified for its purposes to include a security door, which requires a buzzer to enter the office.  Towards the back of the house are small rooms where interviews are conducted, and beyond that area are offices  designated exclusively for the police officers, where Appellant was interviewed. Harley testified that a police officer sat in the front entry room of the house and that she did not feel free to leave before her questioning.  Sergeant Stewart testified that after learning that Hannah’s injuries were life-threatening, Appellant manifested his desire to return to the hospital to see Hannah. Although Sergeant Stewart testified that he was free to leave at any time, an hour passed between the time Appellant expressed his desire to leave and the time that Appellant left the Alliance for Children office.  Sergeant Stewart acknowledged that Appellant was at the Alliance for Children office from 2:30 p.m. until 9:00 p.m.

Additionally, the record reflects that Appellant had become the focus of the investigation. Sergeant Stewart testified that she interviewed Harley and Bayer before interviewing Appellant.  Appellant waited two hours before being interviewed by Sergeant Stewart.  Sergeant Stewart read Appellant his 
Miranda 
rights before he made his first, handwritten statement to police; however, she did not give 
Miranda 
warnings to Harley prior to Harley giving a statement. Sergeant Stewart testified that she gave Appellant the required warnings because she had formed some basis for suspecting him of injuring the child when she spoke with the person who had referred the case to her because Appellant was alone with the child when she was injured. 

The record also reflects that Sergeant Stewart’s knowledge of probable cause was manifested by Appellant.  Initially, Sergeant Stewart was aware that Appellant was alone with Hannah when she was injured; therefore, she realized the likelihood of his involvement with the case.  In addition, after Sergeant Stewart informed Appellant that Hannah’s injuries resulted from being shaken, Appellant informed Sergeant Stewart that he had in fact shaken Hannah. Sergeant Stewart testified that Appellant told her that he had shaken Hannah to revive her, and with a doll, he demonstrated to her how he shook Hannah.  At that point, Appellant gave the second, typewritten statement.  This information, in addition to Sergeant Stewart’s knowledge that Appellant was alone with Hannah when she was injured, amounted to probable cause to arrest.  
See Dowthitt
, 931 S.W.2d at 256. 

In light of the length of the interrogation, the fact that Appellant had become the focus of the investigation, and Appellant’s damaging admission establishing probable cause to arrest, we believe that custody of Appellant began before Appellant gave police his second statement.  Because we reject the State’s contention that Appellant was not in custody at the time he gave police the second statement, we will next examine whether Appellant’s statement was coerced, as Appellant alleges.

4. Voluntariness of the Statement

Under Texas law, a suspect's confession may be used against him only when it is freely and voluntarily made without compulsion or persuasion. 
Tex. Code Crim. Proc. Ann.
 art. 38.21 (Vernon 2005).  A confession may be deemed “involuntary” under three different theories: (1) failure to comply with article 38.22, (2) failure to comply with the dictates of
 Miranda v. Arizona
, or (3) failure to comply with due process or due course of law because the confession was not freely given as a result of coercion, improper influences, or incompetency.  
Wolfe v. State
, 917 S.W.2d 270, 282 (Tex. Crim. App. 1996), 
cert. denied
, 125 S. Ct. 2262 (2005).  The burden of proof at the hearing on admissibility is on the prosecution, which must prove by a preponderance of the evidence that the defendant's statement was given voluntarily.  
Alvarado v. State,
  912 S.W.2d 199, 211 (Tex. Crim. App. 1995).

Appellant contends that his statement was involuntary because his statement was a product of coercion.  He asserts that the second, typewritten statement was a result of Sergeant Stewart and Linder’s putting words into his mouth after informing him that he must have shaken Hannah violently, as evidenced by the fact that his first statement differs materially from the second. He suggests that Sergeant Stewart intentionally caused him to be “emotionally upset” prior to the time he gave his second statement by telling him that Hannah might not survive.  In alleging that the second statement was coerced, Appellant also points to the fact that, according to the times written on the statements indicating when the statements were made, the second statement took an hour and forty-five minutes longer to type than Appellant took to give the initial, handwritten statement.  Appellant did not testify, and the uncontroverted testimony of both Sergeant Stewart and Linder establishes that Appellant was not coerced into giving his second statement.  We do not conclude that merely because Appellant gave a second statement to police after learning of the extent of Hannah’s injuries and because the second statement took longer to compose, the police coerced Appellant into making the statement by intentionally upsetting Appellant emotionally or putting words into Appellant’s mouth. 

Appellant further contends that the atmosphere was coercive because he was held for a period in excess of six hours and, with the exception of Sergeant Stewart and Linder, he was denied access to anyone, including his father.  The fact that Appellant was not informed that his father requested to see him in order to speak with him regarding an attorney is not legally significant, in light of the Supreme Court’s determination that police officers are not required to inform a suspect that his family has retained counsel on his behalf.  
See
 
Moran v. Burbine
, 475 U.S. 412, 420-23, 106 S. Ct. 1135, 1140-41 (1986) (holding that events occurring outside of the presence of the suspect and entirely unknown to him have no bearing on his capacity to comprehend and knowingly relinquish a constitutional right).

Having reviewed the record, we conclude that the evidence presented supports the trial court's finding that no coercive conduct occurred with respect to the taking of Appellant's statement.  We overrule Appellant’s first point.

JURY INSTRUCTION

In his second point, Appellant complains that the trial court erred in failing to give an instruction to the jury regarding the voluntariness of Appellant’s second statement.  Appellant timely requested a jury instruction regarding the voluntariness of his second statement, and the trial court denied the request. The State asserts that article 38.22 is inapplicable because Appellant was not in custody when he made the statement.  We have already rejected this contention.  The State alternatively contends that the record reflects that the trial court properly refused the request for a charge on the voluntariness of Appellant’s second statement because there was no fact issue for the jury to resolve that would impact the admissibility of the statement.
(footnote: 6) 

Appellate review of error in a jury charge involves a two-step process.  
Abdnor v. State
, 871 S.W.2d 726, 731 (Tex. Crim. App. 1994).  Initially, we must determine whether error occurred.  
Id. 
 If so, we must then evaluate whether sufficient harm resulted from the error to require reversal.  
Id.
 at 731-32. 

Under article 38.21, “a statement of an accused may be used in evidence against him if it appears that the same was freely and voluntarily made without compulsion or persuasion. . . .”
  Tex. Code Crim. Proc. Ann.
 art. 38.21.  Article
 
38.23(a) states that no evidence obtained by an officer in violation of any law of the State of Texas shall be admitted into evidence against the accused in the trial of a criminal case. 
 Tex. Code Crim. Proc. Ann.
 art. 38.23(a) (Vernon 2005).  
The terms of article 38.23(a) are mandatory. 
 Mendoza v. State, 
88 S.W.3d 236, 239 (Tex. Crim. App. 2002).  Therefore, when an issue of fact is raised as to compulsion or persuasion in obtaining a confession, a defendant has a statutory right to have the jury charged accordingly.  
Id.; Sorto v. State
, 173 S.W.3d 469, 488 (Tex. Crim. App. 2005).  The evidence that raises the issue may be from any source and may be strong, weak, contradicted, unimpeached, or unbelievable.  
Muniz v. State
, 851 S.W.2d 238, 254 (Tex. Crim. App.), 
cert. denied
, 510 U.S. 837 (1993). 

When a party raises an issue regarding whether evidence was obtained in violation of the laws of Texas or the United States, the jury shall be instructed that if it believes, or has a reasonable doubt, that the evidence was obtained because of such a violation, then the jury shall disregard any such evidence. 
 Tex. Code Crim. Proc. Ann.
 art. 38.23(a); 
see also
 
Miniel v. State
, 831 S.W.2d 310, 316 (Tex. Crim. App.), 
cert. denied
, 506 U.S. 885 (1992); 
Thomas v. State
, 723 S.W.2d 696, 707 (Tex. Crim. App. 1986). 

Error in the charge, if timely objected to in the trial court, requires reversal if the error was “calculated to injure [the] rights of the defendant,” which means no more than that there must be 
some
 harm to the accused from the error.  
Tex. Code Crim. Proc. Ann
. art. 36.19 (Vernon 1981); 
see also Abdnor
, 871 S.W.2d at 731-32; 
Almanza v. State
, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh’g), 
cert. denied
, 481 U.S. 1019 (1987).  In other words, a properly preserved error will call for reversal as long as the error is not harmless.  
Almanza
, 686 S.W.2d at 171.  In making this determination, “the actual degree of harm must be assayed in light of the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole.”  
Id.
; 
see also Ovalle v. State
, 13 S.W.3d 774, 786 (Tex. Crim. App. 2000).  The burden of proof lies with the appellant to persuade the reviewing court that he suffered some actual harm as a consequence of the charging error, and if he is unable to do so, the error will not result in a reversal of his conviction.  
Abnor
, 871 S.W.2d at 732.

In the present case, Appellant did not testify at the suppression hearing or at trial.  On cross-examination of Sergeant Stewart, the following discourse occurred: 

[DEFENSE COUNSEL:]  Isn’t it true that after the typed version was typed up, [Appellant] reviewed it and objected to the portion about violently shaking the baby?

[SERGEANT STEWART:]  No.

[DEFENSE COUNSEL:]  He didn’t tell you that he didn’t want that part in there?

[SERGEANT STEWART:]  No. 

[DEFENSE COUNSEL:]  And the first page wasn’t scratched out, torn up, thrown away, and say [sic] we’ll type it again?

[SERGEANT STEWART:] No.

The State later questioned Linder about the investigation of Appellant:

[PROSECUTOR:] And did [Sergeant Stewart] ask the [Appellant] to demonstrate how he shook that baby?

[LINDER:] Yes, I believe so. 

[PROSECUTOR:] And did you watch him do that demonstration?

[LINDER:] Yes.

[PROSECUTOR:] And could you show this jury how he shook that baby?

[LINDER:] At first just very gently (demonstrating).

[PROSECUTOR:] And knowing what you knew from . . . your investigation at that point, did you all ask him to do that again or correct him in any way and say that’s not possible?

[LINDER:] Well, I explained that the injuries that occurred would not result from a general shaking, they resulted from a violent shaking. 

[PROSECUTOR:] And did you ask the [Appellant] to demonstrate again?

[LINDER:] I don’t recall.

Then, on cross-examination of Linder, the following exchange occurred:

[DEFENSE COUNSEL:] And I know you said it real softly, but I think you said that demonstrating the doll he shook the doll gently?

[LINDER:] Yes, sir.

[DEFENSE COUNSEL:] Not violently?

[LINDER:] Beg your pardon?

[DEFENSE COUNSEL:] Not violently?

[LINDER:] That’s correct.

As evidenced from this dialogue, Linder acknowledged that Appellant demonstrated shaking the baby gently, not violently.  This is some evidence in support of Appellant’s claim that the words in this second statement were not his own and that the statement he signed did not use the term “violently.”  Although the evidence showing compulsion or persuasion in giving the statement may be meager or weak, we determine that the evidence put forth is sufficient to raise a fact issue before the jury regarding whether the statement given to police was in fact Appellant’s statement.  
We conclude that Appellant properly raised this issue before the jury and a fact issue exists for the jury to determine.  We hold that the trial court erred in denying Appellant’s request for a jury instruction on the voluntariness of his second statement.

Having found error, we must conduct a harm analysis to determine whether sufficient harm resulted from the error to require reversal.  
See Abdnor
, 871 S.W.2d at 731.  We review the entire record to determine whether Appellant suffered some actual harm; theoretical harm is not sufficient to constitute reversible error.  
See Arline v. State
, 721 S.W.2d 348, 351-52 (Tex. Crim. App. 1986).  Appellant has not addressed whether he suffered any harm from the trial court’s failure to include the requested instruction, and he did not  point to any portion of the record where harm might be demonstrated.

The evidence established that Appellant was alone with Hannah when she was injured.  Dr. Antinone concluded that Hannah had suffered from Shaken Baby Syndrome.  Dr. Marks testified that not only was Hannah shaken, but her head also must have come into contact with a hard surface.  Linder, who is an experienced CPS investigator, also testified that the injuries Hannah sustained were not consistent with a gentle shaking.  Sergeant Stewart testified that before Appellant gave his second statement, Appellant demonstrated with a doll the manner in which he shook Hannah, and that Appellant demonstrated by shaking the doll violently. 

In light of the record as a whole, we hold that the trial court’s error in refusing to include an instruction as to the voluntariness of the statements did not cause Appellant any harm, and therefore, does not constitute reversible error.
(footnote: 7)  We overrule Appellant’s second point. 

ADMISSION OF MEDICAL RECORDS

In his third point, Appellant complains that the trial court erred in admitting 2,818 pages of medical records containing hearsay without affording  him the right of confrontation.  The State asserts that Appellant’s broad objection was insufficient to allow the trial court to determine what part, if any, of the medical records was inadmissible.  Alternatively, the State contends that the trial court did not abuse its discretion in admitting the medical records pertaining to Hannah’s injuries.

We review a trial court's admission or exclusion of evidence for an abuse of discretion.  
Rankin v. State
, 974 S.W.2d 707, 718 (Tex. Crim. App. 1996) (op. on reh’g); 
Montgomery v. State
, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991) (op. on reh’g).  A trial court does not abuse its discretion, and we will not reverse a trial court's ruling, unless the ruling falls outside the zone of reasonable disagreement.  
Rankin
, 974 S.W.2d at 718.
  
A trial court abuses its discretion when it acts without reference to any guiding rules and principles or acts arbitrarily or unreasonably.  
Montgomery
, 810 S.W.2d at 380.

The court of criminal appeals has recognized that when faced with a general objection the trial court has no obligation to sort through the challenged evidence in order to segregate admissible evidence from inadmissible evidence.  
Barnes v. State, 
876 S.W.2d 316, 329 (Tex. Crim. App.), 
cert. denied
, 513 U.S. 861 (2004).  The court recognized that the trial court may choose to admit or exclude the evidence as a whole, and the losing party will suffer the consequences for his failure to object with sufficient specificity. 
Id.

While Appellant specified the legal basis for his objection, he failed to specify the portion or portions of the 2,818 pages of medical records where the obejctionable statements may be found.  Instead, Appellant made what can be characterized as a “general” objection that the medical records violated the confrontation clause under the holding of 
Crawford v. Washington
, 541 U.S. 36, 59, 124 S. Ct. 1354, 1369 (2004), because the medical records contained statements made by doctors who did not testify at trial, and thus, were not subject to cross-examination.  At no point did Appellant specify the pages that contained the statements by the doctors who were not subject to cross-examination.  We hold that the trial court did not abuse its discretion by overruling Appellant’s broad objection to the 2,818 pages of medical records.  Accordingly, we overrule Appellant’s third point. 

LEARNED TREATISE

In his final point, Appellant argues that the trial court erred in failing to admit an article from the British Medical Journal that refuted the scientific theory upon which the State’s medical experts relied.  The State contends that the trial court did not abuse its discretion in refusing to admit the article because a learned treatise is not admissible as an exhibit. 

We review a trial court's admission or exclusion of evidence for an abuse of discretion.  
Rankin
, 974 S.W.2d at 718; 
Montgomery
, 810 S.W.2d at 391.  A trial court does not abuse its discretion, and we will not reverse a trial court's ruling, unless the ruling falls outside the zone of reasonable disagreement.  
Rankin
, 974 S.W.2d at 718.

Texas Rule of Evidence 803(18) provides that a learned treatise is not excluded as hearsay to the extent it is called to the attention of an expert witness upon cross-examination.
(footnote: 8)  
Tex. R. Evid.
 803(18).  If admitted, the rule allows the statements to be read into evidence, but the statements may not be received as exhibits.  
Id.  
The clear language of the rule prohibits the publication of the learned treatise to the jury.
  See id.

In the present case, Appellant had the opportunity to cross-examine the State’s medical experts on Shaken Baby Syndrome and the minority viewpoint contained in the article suggesting that injuries such as those sustained by Hannah could result from causes other than Shaken Baby Syndrome.  We hold that the trial court did not abuse its discretion in refusing to receive the article itself as an exhibit.  We overrule Appellant’s fourth point.

CONCLUSION

Having overruled each of Appellant’s four points, we affirm the trial court’s judgment.

PER CURIAM

PANEL F:  HOLMAN, LIVINGSTON, and DAUPHINOT, JJ.

DO NOT PUBLISH

Tex. R. App. P.
 47.2(b)

DELIVERED:  December 22, 2005

FOOTNOTES
1:
See 
Tex. R. App. P.
 47.4

2:
The name of the agency has changed to the Texas Department of Family and Protective Services effective September 1, 2003.  
See
 Act of June 2, 2003, 78th
 Leg., R.S., ch. 198, §§ 1.01(b)(4)(J), 1.27, 2003 Tex. Gen. Laws 611, 641, 729.

3:
See
 
Miranda v. Arizona
, 384 U.S. 436, 86 S. Ct. 1602 (1966).  

4: The first statement contained typewritten 
Miranda
 warnings and blank lines for a person to write a narrative.  The form provides a line for the signature of the affiant and a witness and a place to fill in the time, place, and date.  Appellant’s first statement is handwritten and each of the three pages is signed by Appellant and a witness, and the time, place, and date lines have been filled in.  Appellant’s second statement is two pages long and is completely typewritten.  There is no signature line on the first page.  There is a signature line on the second page for the affiant and a witness, both of whom signed the second page.

5: In his argument on appeal, Appellant acknowledges that his first statement was voluntarily given. 

6: In a footnote, the State asserts that Appellant’s trial objection does not comport with his complaint on appeal because at trial Appellant requested a jury instruction as to the voluntariness of the oral statements, but on appeal Appellant refers to the voluntariness of the written statements he made to Sergeant Stewart.  It is clear from the record that the parties and the trial court understood the basis for Appellant’s objection in light of the State’s response to that objection.

7:
See Hernandez v. State
, No. 03-02-00489-CR, 2003 WL 22207209, at *2-3 (Tex. App.—Austin Sept. 25, 2003, no pet.) (mem. op.) (not designated for publication) (holding jury should have received article 38.23 instruction regarding the appellant’s statement, but failure to so instruct was not reversible error because in light of the entire record, the trial court's error in refusing to include a general instruction as to the admissibility of a statement did not cause the appellant any harm).

8: Rule 803(18) exempts statements contained in published treatises, periodicals, or pamphlets on a subject of history, medicine, or other science or art, established as a reliable authority by the testimony or admission of the witness or by other expert testimony or by judicial notice from the rule prohibiting hearsay.